**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DOE, *et al*. on behalf of themselves and all persons similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SCOTT KUPOR, in his official capacity as Director of the UNITED STATES OFFICE OF PERSONNEL MANAGEMENT<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:26-cv-02723-APM |

**PLAINTIFFS CHARLOTTE COE AND VANESSA VOE'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 4

III. LEGAL STANDARD ........ 18

IV. ARGUMENT ........ 19

A. Plaintiffs and the Putative Class Face Irreparable Harm Absent an Injunction. ........ 19

B. Plaintiffs Are Likely to Succeed on the Merits of Their Title VII Claim. ........ 26

1. The 2027 Carrier Letter Facially Discriminates Because Of Sex ........ 28

2. The 2027 Exclusion Also Enforces Impermissible Sex Stereotypes. ........ 32

C. The Balance of the Equities Weighs in Favor of Plaintiffs Because the Public Interest is Best Served by the Issuance of a Preliminary Injunction. ........ 35

D. The Court Should Waive Security or Require Only a Nominal Bond. ........ 38

E. Plaintiffs Have Standing to Challenge the 2027 Exclusion ........ 39

1. Plaintiffs Face Denial of Coverage for Their Prescribed Care. ........ 40

2. Plaintiffs' Injuries Are Fairly Traceable to the 2027 Carrier Letter and Redressable by Injunctive Relief. ........ 41

V. CONCLUSION ........ 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*,
463 U.S. 1073 (1983) .......... 30

*Barnes v. Costle*,
561 F.2d 983 (D.C. Cir. 1977) .......... 30

*Bontrager v. Ind. Fam. & Soc. Servs. Admin.*,
697 F.3d 604 (7th Cir. 2012) .......... 37

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .......... *passim*

*Bouknight v. District of Columbia*,
680 F. Supp. 2d 96 (D.D.C. 2010) .......... 29

*Boyden v. Conlin*,
341 F. Supp. 3d 979 (W.D. Wis. 2018) .......... 30, 34

*Cable News Network, Inc. v. Trump*,
No. 26-cv-3287 (D.D.C. Oct. 13, 2026), Dkt. No. 50 .......... 38

*Cannon v. Allied Universal Sec. Servs.*,
2025 WL 3516157 (D.D.C. July 28, 2025) .......... 19

*Chandler v. Roudebush*,
425 U.S. 840 (1976) .......... 31

*Cherokee Nation v. U. S. Dep't of the Interior*,
643 F. Supp. 3d 90 (D.D.C. 2022) .......... 41

*City of L.A., Dep't of Water & Power v. Manhart*,
435 U.S. 702 (1978) .......... 27, 29

*Czekalski v. Peters*,
475 F.3d 360 (D.C. Cir. 2007) .......... 27

*Doe v. Ladapo*,
737 F. Supp. 3d 1240 (N.D. Fla. 2024) .......... 34

*Drs. for Am. v. OPM*,
766 F. Supp. 3d 39 (D.D.C. 2025) .......... 20, 24, 35

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) ... 38

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ... 21

*Endocrine Soc'y v. FTC*,
No. 26-cv-512 (D.D.C. May 7, 2026) ... 33

*Figueroa v. Pompeo*,
923 F.3d 1078 (D.C. Cir. 2019) ... 27

*Flack v. Wis. Dep't of Health Servs.*,
328 F. Supp. 3d 931 (W.D. Wis. 2018) ... 22

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ... 39

*K.G. ex rel. Garrido v. Dudek*,
839 F. Supp. 2d 1254 (S.D. Fla. 2011) ... 37

*General Electric Co. v. Gilbert*,
429 U.S. 125 (1976) ... 31

*Gordon v. Aetna Life Ins. Co.*,
2026 WL 643134 (D. Conn. Mar. 8, 2026) ... 21, 31

*Hammons v. Univ. of Maryland Med. Sys. Corp.*,
649 F. Supp. 3d 104 (D. Md. 2023) ... 30

*Hicklin v. Precynthe*,
2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ... 21

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ... 27

*Hively v. Ivy Tech Cmty. Coll. of Indiana*,
853 F.3d 339 (7th Cir. 2017) ... 34

*Int'l Long Term Care, Inc. v. Shalala*,
947 F. Supp. 15 (D.D.C. 1996) ... 19, 35

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*,
499 U.S. 187 (1991) ... 29

*Kansas Corp. Comm'n v. FERC*,
881 F.3d 924 (D.C. Cir. 2018) ... 39

*Karnoski v. Trump*,
2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ....................22

*Koe v. Noggle*,
688 F. Supp. 3d 1321 (N.D. Ga. 2023) ....................21, 22, 24, 36

*L.W. by & through Ward v. Comm'r of Ga. Dep't of Cmty. Health*,
176 F.4th 635 (11th Cir. 2026) ....................20

*LaForest v. Former Clean Air Holding Co.*,
376 F.3d 48 (2d Cir. 2004) ....................21

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ....................38

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ....................19, 35

*Lee v. Christian Coal. of Am., Inc.*,
160 F. Supp. 2d 14 (D.D.C. 2001) ....................20

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................40, 41

*Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*,
793 F. Supp. 3d 166 (D.D.C. 2025) ....................39

*Moore v. Summers*,
113 F. Supp. 2d 5 (D.D.C. 2000) ....................36

*Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026) ....................18

*In re Navy Chaplaincy*,
697 F.3d 1171 (D.C. Cir. 2012) ....................39

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
462 U.S. 669 (1983) ....................27, 31

*Nken v. Holder*,
556 U.S. 418 (2009) ....................35

*Olson v. Wing*,
281 F. Supp. 2d 476 (E.D.N.Y. 2003) ....................22

*PFLAG, Inc. v. Trump*,
769 F. Supp. 3d 405 (D. Md. 2025) ....................21, 24, 36

*PFLAG, Inc. v. Trump*,
No. 25-1279 (4th Cir. July 25, 2025)....................31

*Phelan v. Noem*,
2025 WL 2732749 (D.D.C. Sept. 25, 2025)....................27

*Phillips v. Martin Marietta Corp.*,
400 U.S. 542 (1971)....................30

*Planned Parenthood S. Atl. v. Baker*,
941 F.3d 687 (4th Cir. 2019)....................20

*Poe ex rel. Poe v. Labrador*,
709 F. Supp. 3d 1169 (D. Idaho 2023)....................21, 24

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989)....................34

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*,
2023 WL 8777349 (W.D. Wash. Dec. 19, 2023)....................35, 36, 37

*Sam T. v. Kupor*,
EEOC Appeal Nos. 0120172750, 0120172751, 2020000643 & 2021005019,
(Mar. 24, 2026)....................31

*Schroer v. Billington*,
577 F. Supp. 2d 293 (D.D.C. 2008)....................27, 34

*Singletary v. District of Columbia*,
351 F.3d 519 (D.C. Cir. 2003)....................27

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir. 2026)....................32, 34

*United States v. Skrmetti*,
605 U.S. 495 (2025)....................31

*Washington v. Trump*,
No. 25-cv-244 (W.D. Wash. Feb. 16, 2025)....................33

*West Virginia v. B. P. J. by Jackson*,
609 U.S. 958 (2026)....................27

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020)....................34

*Williams v. Walsh*,
619 F. Supp. 3d 48 (D.D.C. 2022)....................20

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................19, 35

*Worth v. Jackson*,
451 F.3d 854 (D.C. Cir. 2006)....................40

**Statutes**

5 U.S.C. § 8902....................11

42 U.S.C. § 2000e-2....................2, 27

42 U.S.C. § 2000e-16....................27

**Other Authorities**

5 C.F.R. § 890.203(b)....................11

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (EO 14168) |
| B | Executive Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025) (EO 14187) |
| C | U.S. Office of Personnel Management, Carrier Letter No. 2025-01b, *Chemical and Surgical Sex-Trait Modification Services for Plan Year 2026 Proposals* (Aug. 15, 2025) |
| D | U.S. Office of Personnel Management, Carrier Letter No. 2026-07, *Federal Employees Health Benefits and Postal Service Health Benefits Programs Call Letter* (Mar. 31, 2026) |
| E | Declaration of Jody L. Herman (Herman Decl.), dated November 3, 2026 |
| F | Declaration of Charlotte Coe (Coe Decl.), dated November 3, 2026 |
| G | Declaration of Vanessa Voe (Voe Decl.), dated November 2, 2026 |
| H | Declaration of Diane Shallcross (Shallcross Decl.), dated October 30, 2026 |
| I | Declaration of Elizabeth Oleson (Oleson Decl.), dated October 30, 2026 |
| J | Declaration of Amy R. (Amy R. Decl.), dated October 30, 2026 |
| K | Declaration of Quinn H. (Quinn H. Decl.), dated November 2, 2026 |
| L | Declaration of Christine F. (Christine F. Decl.), dated January 25, 2026 |
| M | Jennifer C. Declaration (Jennifer C. Decl.), dated January 29, 2026 |
| N | Declaration of Nancy F. (Nancy F. Decl.), dated January 26, 2026 |

## I. INTRODUCTION

This is a case about the federal government refusing to provide its workers and their loved ones with the basic healthcare it has promised them. Under Title VII of the Civil Rights Act of 1964, the federal government cannot discriminate in its provision of employee benefits on the basis of sex. For many years, the U.S. Office of Personnel Management, which administers federal healthcare, covered gender-affirming care. For movant Plaintiffs Charlotte Coe and Vanessa Voe, and thousands of others, this care is critical to their physical and emotional well-being. Ms. Coe and Ms. Voe require ongoing hormone therapy because their bodies no longer produce the hormones they need. Ms. Coe urgently needs surgical care for a painful genital lesion. Yet, in a deeply cruel and discriminatory manner, OPM has issued a blanket ban on insurance coverage for transgender beneficiaries' hormonal and surgical care for gender transition in Plan Year 2027. This Court's intervention is necessary to prevent certain harm to Plaintiffs and other class members.

Every insurance carrier that participates in the Federal Employees Health Benefits (FEHB) and Postal Service Health Benefits (PSHB) programs must enforce OPM's policy to exclude coverage for hormonal and surgical care for gender transition in Plan Year 2027 (the 2027 Exclusion). OPM imposes the ban through carrier letters – directives establishing coverage requirements for the insurers participating in those programs – to implement President Trump's January 2025 executive orders declaring sex immutable and restricting federal support for gender transition. OPM issued Carrier Letter No. 2025-01b (the 2026 Carrier Letter), to be implemented in Plan Year 2026, which prohibits all coverage for gender-affirming care, while retaining a limited exceptions process for those already undergoing hormonal or surgical treatment. Carrier Letter No. 2026-07 (the 2027 Carrier Letter) retains the ban on chemical and surgical care for gender transition *and* eliminates the exceptions process in Plan Year 2027. Together, these directives (the

Carrier Letters) require carriers in Plan Year 2027 to deny coverage both to beneficiaries continuing treatment and to those seeking to begin it, regardless of how urgently the care is needed.[1] OPM's ban on gender-affirming care violates Title VII of the Civil Rights Act of 1964 (Title VII). 42 U.S.C. § 2000e-2.

Ms. Coe and Ms. Voe (Plaintiffs), on behalf of themselves and the putative class, respectfully request that this Court temporarily enjoin the 2027 Exclusion's implementation pending resolution of this matter. As described below, the extraordinary relief of a preliminary injunction is necessary to protect Plaintiffs from irreparable harm from the pending 2027 Exclusion. Ms. Coe, an IT specialist at the Department of State, has developed a painful lesion in her urethral tissue following vaginoplasty. The lesion repeatedly reopens, makes even sitting painful, and puts her at risk of infection. Her surgeon has recommended corrective surgery but will not operate in the absence of insurance coverage. The 2027 Exclusion will keep that surgery out of reach and prolong her suffering. For both Ms. Coe and Ms. Voe, a researcher at the Department of War, the 2027 Exclusion will require them to continue paying the full cost for hormone therapy, which they cannot sustain. Both Plaintiffs will have to ration their prescribed hormones. Rationing can cause debilitating symptoms, such as intrusive thoughts, mental and emotional upheaval, and withdrawal. Moreover, both Plaintiffs no longer produce sex hormones. Going without hormone replacement therapy (HRT) therefore harms Plaintiffs' physiology in many ways, including the risk of loss of bone density. All of these physical harms are compounded by the emotional and financial strain caused by the 2027 Exclusion, which causes harm to Plaintiffs that cannot be

[1] *See* OPM, FEHB Program Carrier Letter No. 2025-01a, at 1–2 (Jan. 31, 2025) (implementing Executive Order Nos. 14168 and 14187); OPM, FEHB Program Carrier Letter No. 2025-01b, at 1–2 (Aug. 15, 2025); OPM, *FEHB Program Carrier Letter No. 2026-07*, at 2, 14 (Mar. 31, 2026).

undone.

Plaintiffs are highly likely to succeed on their Title VII claim, and they need relief before the 2027 plan year begins on January 1, 2027, for PSHB beneficiaries and January 10, 2027, for FEHB beneficiaries.[2] The World Professional Association for Transgender Health (WPATH) recognizes the medical necessity of hormonal and surgical care for gender transition and recommends continuing HRT for eligible patients because of its benefits for psychosocial functioning and quality of life.[3] Yet, under the 2027 Exclusion, no patient's medical need can overcome OPM's categorical bar to coverage. OPM continues to cover the same medications and procedures for other purposes. Discrimination such as this based on transgender status necessarily entails discrimination based on sex. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020). The exclusion also enforces the sex stereotype that a person's physical characteristics must conform to their sex assigned at birth. No amount of damages can reverse the pain and psychological injury Plaintiffs will endure while this case proceeds if the 2027 Exclusion is permitted to take effect. The equities and public interest, which favor individuals having access to their medically necessary healthcare, likewise weigh in support of granting Plaintiffs' relief. This Court should therefore grant Plaintiffs' request for a preliminary injunction barring OPM from enforcing the 2027 Exclusion and requiring OPM to direct carriers to administer coverage for Plaintiffs and the

---

[2] *See* DailyFED Staff, *Important Dates for Federal Employees: October 2026 to January 2027*, Fed'n of Fed. Emp. Benefit Advocs. (Oct. 23, 2026), https://ffeba.com/news/important-dates-federal-employees-october-2026-january-2027/ (last visited Nov. 3, 2026); U.S. Off. of Pers. Mgmt., Federal Benefits Open Season Highlights 2027 Plan Year, https://www.opm.gov/healthcare-insurance/open-season/agency-benefits-officers/housing-for-os-materials/2026-federal-benefits-open-season-highlights-for-plan-year-2027.pdf (last visited Nov. 3, 2026).

[3] Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S16–18, S125–26 (2022) (Statements 2.1 and 12.20).

proposed class under otherwise applicable, nondiscriminatory plan terms.[4]

## II. BACKGROUND

***Gender Identity and Gender-Affirming Care***

Gender identity is a person's internal sense of their gender.[5] Transgender people have a gender identity that differs from the sex assigned to them at birth. For many, living in accordance with that identity includes medical treatment to bring their physical characteristics into alignment with who they are. Gender-affirming care encompasses medical treatment, such as HRT; procedures and surgeries involving the chest, face, or genitals; and the monitoring and regular follow-up care those procedures require. The appropriate course of treatment a transgender person receives depends on their needs and circumstances; not every transgender person needs the same interventions. For those who need it, this care offers profound relief, as it did for Plaintiff Vanessa Voe, who found happiness after beginning her transition. Ex. G, Declaration of Vanessa Voe (Voe Decl.) ¶ 4; *see also* Ex. H, Declaration of Diane Shallcross (Shallcross Decl.) ¶ 7 (explaining that Ms. Voe's gender-affirming care "is an essential component" of her well-being and has been "critical" for her "achieving that stability").

The need for treatment can be urgent and deeply consequential. For some transgender people, the incongruence between their gender identity and their bodies, or how others perceive them, causes profound distress that interferes with work, relationships, and daily life. When that incongruence is associated with clinically significant distress or impairment, it may be diagnosed as gender dysphoria, a condition recognized in the American Psychiatric Association's *Diagnostic*

---

[4] Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel conferred with Defendant's counsel regarding this Motion, and Defendant's counsel stated that Defendant opposes this Motion.

[5] Am. Psychiatric Ass'n, *What Is Gender Dysphoria?*, https://perma.cc/TJ2L-UJL3 (last visited Oct. 30, 2026) (hereinafter APA, Gender Dysphoria).

*and Statistical Manual of Mental Disorders*. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 512–13 (5th ed., text rev. 2022). Gender incongruence can be accompanied by depression, anxiety, or suicidal thoughts. APA, *Gender Dysphoria*; Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., text rev. 2022). At times compounding that internal distress, transgender people face discrimination, harassment, and violence.[6] Effective treatment addresses the source of that distress and helps restore the ability to participate fully in daily life.

Hormonal and surgical treatment are established forms of medical care. The Endocrine Society recognizes appropriately monitored hormone therapy and medically indicated surgery as effective, relatively safe, and "established as the standard of care." Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clin. Endocrinology & Metabolism 3869 (2017), https://doi.org/10.1210/jc.2017-01658 (hereinafter Endocrine Society Guideline). The American Medical Association likewise recognizes the medical necessity of treatments for gender incongruence and transition when determined through shared decision-making between patient and provider. Am. Med. Ass'n, *Clarification of Evidence-Based Gender-Affirming Care*, Policy H-185.927 (reaffirmed 2024), https://perma.cc/N6TG-LPZ4. Access to gender-affirming care can

[6] National crime-victimization data show a higher rate of violence against transgender people than against non-transgender people. A separate survey of transgender people found that those perceived as transgender were more likely to report harassment and violence. *See* Andrew R. Flores et al., *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018*, 111 Am. J. Pub. Health 726, 726–27 (2021), https://doi.org/10.2105/AJPH.2020.306099; Abigail Tessmer & Meredith G. F. Worthen, *Transgender Realities: The Relationship Between Transgender Visibility, Race, and Victimization*, 41 J. Interpersonal Violence 4402 (2026), https://doi.org/10.1177/08862605251347648 (analyzing the 2015 U.S. Transgender Survey).

relieve distress and improve a person's well-being and ability to function in daily life. The care can include counseling as well as hormone therapy and surgery. WPATH's *Standards of Care* guide the selection, administration, and monitoring of these treatments. Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S17–S18, S125–S127 (2022), https://doi.org/10.1080/26895269.2022.2100644 (hereinafter SOC-8). The standards of care, across the board, acknowledge that this care can be lifesaving.

HRT enables physiological changes that are central to many people's transition. HRT may include estrogen, sometimes with medication to suppress testosterone, or testosterone. UCSF Gender Affirming Health Program, *Information on Estrogen Hormone Therapy*, § "Physical changes," https://perma.cc/6HSX-KCW9; *id.*, *Information on Testosterone Hormone Therapy*, § "Physical changes," https://perma.cc/7RXQ-QHMS. The benefits extend to mental health and daily functioning. In a randomized clinical trial of adults seeking testosterone therapy, those who began treatment immediately experienced significantly greater reductions in gender dysphoria, depression, and suicidality within three months than those assigned to wait. Brendan J. Nolan et al., *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, 6 JAMA Network Open e2331919 (2023), https://doi.org/10.1001/jamanetworkopen.2023.31919. A separate study following 342 adults who began estrogen or testosterone through a telehealth service found significant reductions in depression and anxiety over three months. Among those with elevated symptoms at baseline, approximately 40% experienced a reduction of at least half in their depression or anxiety scores. Downing Corman et al., *Mental Health Changes in US Transgender Adults Beginning Hormone Therapy Via Telehealth: Longitudinal Cohort Study*, 27 J. Med. Internet Rsch. e64017 (2025),

https://doi.org/10.2196/64017 (reporting a clinically meaningful response, defined as at least a 50% reduction in symptoms, in 42% of participants with elevated depression symptoms and 40% with elevated anxiety symptoms at baseline). Consistent with these benefits, the Standards of Care recommend initiating and continuing HRT for eligible people to improve psychosocial functioning and quality of life. SOC-8, *supra*, at S125–26 (Statement 12.20). For many patients, HRT must be ongoing. SOC-8, at S118–S127; Endocrine Society Guideline, at 3883–88. In the 2022 U.S. Transgender Survey, 90% of adult respondents who had ever received HRT reported that they were still receiving it. Ex. E, Declaration of Jody L. Herman (Herman Decl.) ¶ 27.

For some individuals, surgical care is also an essential part of treatment. Hormones do not produce every physical change a person in gender transition may need; surgery can help align a person's body with their gender identity and alleviate associated distress. Surgical care includes follow-up care and, at times, requires revision procedures. In a review of 79 studies examining outcomes at least one year after gender-affirming surgery, researchers found generally that patients reported satisfaction with their results. Christienne Javier et al., *Surgical Satisfaction and Quality of Life Outcomes Reported by Transgender Men and Women at Least One Year Post Gender-Affirming Surgery: A Systematic Literature Review*, 23 Int'l J. Transgender Health 255, 255–56 (2022), https://doi.org/10.1080/26895269.2022.2038334; SOC-8, at S125–S126, S131–S133. For people who need those changes, surgery is an essential part of treatment. Its benefits reach beyond the physical result. A study of nearly 20,000 transgender adults who desired surgery found that those who had undergone one or more gender-affirming procedures at least two years earlier had significantly lower adjusted odds of severe psychological distress and suicidal ideation than those who had not received surgery. Anthony N. Almazan & Alex S. Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156 JAMA Surgery 611, 611–15

(2021), https://doi.org/10.1001/jamasurg.2021.0952 (analyzing 19,960 respondents who desired surgery and reporting adjusted odds ratios of 0.58 for severe psychological distress and 0.56 for suicidal ideation among those who had received surgery). Surgical care also includes the follow-up and revision procedures needed to address postoperative concerns. Ms. Coe's need for corrective surgery illustrates the stakes: she experiences daily pain from a postoperative lesion, and even sitting aggravates it. Ex. F, Declaration of Charlotte Coe (Coe Decl.) ¶¶ 9–10. Her doctor has recommended surgery to correct the problem. *Id.*

For people receiving ongoing HRT, maintaining the benefits of treatment requires continued access. Continued HRT is especially important after the removal of the testes or ovaries, which permanently eliminates a principal source of the body's sex hormones. Hormone therapy supplies replacement hormones that protect transgender individuals against the consequences of that loss. Without adequate replacement, individuals can experience hot flashes and chronic fatigue and, over time, develop bone loss that leaves them vulnerable to serious and disabling fractures. Continued treatment also helps preserve mental health and quality of life. The Standards of Care therefore emphasize the importance of continued hormone treatment after these surgeries. SOC-8, at S125, S153–S154; *Endocrine Society Guideline*, at 3891–92; UCSF Gender Affirming Health Program, *Information on Estrogen Hormone Therapy*, §§ "Reproductive System Changes" & "Risks," https://transcare.ucsf.edu/article/information-estrogen-hormone-therapy; UCSF Gender Affirming Health Program, *Information on Testosterone Hormone Therapy*, § "Risks" (Mar. 2025), https://transcare.ucsf.edu/article/information-testosterone-hormone-therapy. When needed care is delayed or interrupted, patients experience physical and emotional consequences; those awaiting surgery continue to live with the distress or physical symptoms the procedure is meant to address.

Losing access to HRT can leave people physically unwell, interrupt their transition, and make securing the next dose a source of persistent distress. In interviews with transgender and gender-expansive adults, participants described feeling physically ill after abrupt changes in hormone levels and having their transitions stalled by interrupted treatment. One described the prospect of losing the changes achieved through HRT as "[a]ll the work in progress just goes away." Blake Aaron Kosciow et al., *Qualitative Insights into the Experiences and Consequences of Inconsistent Access to Gender-Affirming Care Among Transgender and Gender Expansive People*, 23 Discover Pub. Health art. 1091, 8 (2026), https://doi.org/10.1186/s12982-026-02448-2. Cost and insurance barriers also drove some participants to obtain hormones without a prescription, outside medical supervision. *Id.* (qualitative interviews with 29 adults in the Philadelphia metropolitan area).

These concerns extend across the federal workforce and the families who rely on their health benefits. Dr. Jody Herman of the Williams Institute estimates that between 39,400 and 57,800 transgender people are covered by FEHB and PSHB, including employees, retirees, and dependents. Herman Decl. ¶¶ 12, 22. One FEHB employee described the relief HRT brought from severe anxiety: "I feel more peaceful, more at home in my own mind and body than I ever have." Ex. J, Declaration of Amy R. (Amy R. Decl.) ¶ 13. For others, coverage made follow-up care possible to address complications or preserve results from earlier treatment. Ex. K, Declaration of Quinn H. (Quinn H. Decl.) ¶ 10. For those who need gender-affirming care and cannot afford it without coverage, insurance determines whether they receive that care or go without it.

***The Administration directed all federal agencies, including OPM, to reject transgender identities and restrict access to gender-affirming care***

On his first day in office, President Trump ordered federal agencies to withdraw recognition of transgender people's gender identities. Executive Order 14168, titled "Defending

Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," declared sex immutable and characterized transgender identities as a "false claim." Ex. A, Exec. Order No. 14168, 90 Fed. Reg. 8615, 8615-16 (Jan. 20, 2025) (EO 14168). The Order directed agencies to adopt that rule in their administration of federal law, remove policies and communications that supported what it termed "gender ideology," and end federal funding that promoted that ideology. *Id.* at 8616. EO 14168's reach extended from government-issued identification to federal employees' personnel records, which OPM was specifically directed to change to reflect the Order's definition of sex. *Id.* The Administration made repudiation of transgender identities a government-wide directive.

Eight days later, the President specifically directed agencies to restrict access to gender-affirming medical care. Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation," described providers of gender-affirming care as "maiming and sterilizing" children and directed the federal government to withhold support for transition-related care for anyone under nineteen. Ex. B, Exec. Order No. 14187, 90 Fed. Reg. 8771, 8771 (Jan. 28, 2025) (EO 14187). It also ordered agencies to use federal research and education grants to pressure medical institutions to stop providing that care. *Id.* at 8772. And EO 14187 directed Defendant OPM to require FEHB and PSHB carriers to exclude gender-affirming care for youth from 2026 plan coverage. *Id.* The President prescribed that exclusion in the same Order that directed the U.S. Department of Health and Human Services (HHS) to conduct a review of the medical literature within ninety days. *Id.* at 8771. The President thus ordered the youth exclusion before HHS completed the review that the Order itself commissioned.[7]

---

[7] HHS published the commissioned review on May 1, 2025, and revised it on November 19, 2025. *See* U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* 1 (Nov. 19, 2025). The report expressly states that treatment

***OPM implemented the executive orders through a mandatory exclusion in federal employees' health plans***

Without delay, OPM implemented the Administration's directives through its control over federal employees' health benefits. OPM contracts with private insurance carriers to provide insurance coverage to federal employees through the FEHB and PSHB programs. OPM also dictates the scope of those carriers' coverage and determines the benefits and exclusions their contracts must contain. 5 U.S.C. § 8902(a), (d). Carrier letters convey OPM's coverage requirements and instructions to those insurers; annual call letters govern the benefit and rate proposals carriers submit for the coming plan year. *See* OPM, *Carrier Handbook: Federal Employees Health Benefits Program*, at 10, 13 (Mar. 2003), https://perma.cc/5L9U-5QM4; 5 C.F.R. § 890.203(b).

Prior to the Administration's directives, OPM prohibited FEHB and PSHB carriers from categorically excluding gender-affirming care, including genital, breast, and facial gender-affirming surgeries, from insurance coverage. OPM, *FEHB Program Carrier Letter No. 2023-12*, at 1 (May 23, 2023). Carriers retained flexibility to design benefits and a methodology to assess individual claims, but OPM required consistent, neutral coverage determinations that did not discriminate against enrollees and medical policies consistent with up-to-date standards of care. *Id.* at 1-2.

On January 31, 2025—eleven days after EO 14168 and just three days after EO 14187—OPM reversed course in Carrier Letter 2025-01A. Indeed, OPM identified both executive orders (rather than medically supported standards of care) as the reason for the change: "[t]wo recently

of adults "is not addressed in this Review." *Id.* at 11. It also makes no policy recommendations concerning children and adolescents who have already begun puberty blockers or hormone therapy. *Id.* at 270. Neither the August 2025 letter extending the exclusion to adults nor the 2027 Carrier Letter eliminating ongoing-treatment exceptions cites the review. *See* 2026 Carrier Letter, at 1–2; 2027 Carrier Letter at 14.

issued Executive Orders of President Trump have prompted this Addendum." OPM, *FEHB Program Carrier Letter No. 2025-01A*, at 1 (Jan. 31, 2025). Under EO 14168, OPM instructed carriers to stop requesting gender identity on forms and, pursuant to EO 14187, to stop covering transition-related surgeries and HRT for people under nineteen starting in the 2026 plan year. *Id.* at 1-2. For enrollees nineteen and older, the January letter made coverage of transition-related surgeries and HRT optional for carriers in 2026. *Id.* at 2.

But before the 2026 plan year began, OPM pivoted to a mandatory restriction on coverage for gender-affirming care for adults. On August 15, 2025, Defendant issued the Carrier Letter 2025-01b (2026 Carrier Letter), which prohibits coverage for "chemical and surgical modification of an individual's sex traits through medical interventions (to include 'gender transition' services)" (hereinafter, "gender-affirming care"). Ex. C, OPM, Carrier Letter No. 2025-01b, *Chemical and Surgical Sex-Trait Modification Services for Plan Year 2026 Proposals* at 1 (Aug. 15, 2025). For plan year 2026, OPM also required carriers to establish a case-by-case exceptions process for enrollees already receiving a surgical or hormonal regimen for diagnosed dysphoria, whom it describes as "mid-treatment." *Id.* at 2. The 2026 Carrier Letter does not define the term "mid-treatment." *See generally id.*

The absence of any medical rationale makes sense, given that the exclusion does not turn on the medical safety or clinical effectiveness of the procedures, it turns on their *use* for gender transition. For instance, OPM instructs carriers not to exclude entire pharmaceutical classes on the basis of the gender-affirming care exclusion, explaining that GnRH agonists may also be prescribed during IVF, for endometriosis or fibroids, and for cancer treatment or prevention. *Id*. at 2. FEHB plans likewise can and have continued to cover surgical interventions for other purposes, such as breast implants following mastectomy and surgical placement of penile prostheses to treat

erectile dysfunction. Blue Cross & Blue Shield Service Benefit Plan, *2026 Brochure*, §§ 5(a) ("Orthopedic and Prosthetic Devices"), 5(b) ("Reconstructive Surgery").

***The 2027 Carrier Letter eliminates the exception for ongoing treatment across all carriers***

On March 31, 2026, OPM issued the Carrier Letter 2026-07 (2027 Carrier Letter), which governs the 2027 plan year. Addressed to all FEHB and PSHB carriers, the 2027 Carrier Letter retained prior OPM policy unless expressly changed. Ex. D, OPM, Carrier Letter No. 2026-07, *Federal Employees Health Benefits and Postal Service Health Benefits Programs Call Letter* at 1–2 (Mar. 31, 2026). Under the heading "Sex Rejection Treatments," referring to gender-affirming care, OPM directed carriers to "remove any exceptions process" for enrollees "mid-treatment within a surgical and/or hormonal regimen for diagnosed gender dysphoria." *Id.* at 14. Like the 2026 Carrier Letter, the 2027 Carrier Letter cites no medical study, HHS report, or clinical finding supporting elimination of gender-affirming care. At this juncture, counseling for gender transition remains covered. *Id.* at 1. OPM again expanded the exclusion without citing a single medical study or clinical finding to justify the change.

The 2027 Carrier Letter completes OPM's implementation of the President's vision for a ban on gender-affirming hormonal and surgical care. The Administration's rejection of transgender identities is now a mandatory term of federal employees' health coverage. Every participating carrier must eliminate coverage for gender-affirming care, and changing plans within FEHB or PSHB cannot restore it. Plaintiffs' motion challenges that common directive as it takes effect for the 2027 plan year. *See* Carrier Letter 2023-12, at 1-2; 2026 Carrier Letter, at 1-2; 2027 Carrier Letter at 2, 14.

Nationwide, federal employees are preparing for "open season," which begins on November 9, 2026. According to OPM, open season is "the time of year to ensure that you have the right health, dental or vision insurance coverage for you and your family." U.S. Off. of Pers.

Mgmt., *Frequently Asked Questions, What is Open Season?*, https://perma.cc/G28E-UZZ9, (last visited Oct. 28, 2026). Plaintiffs have until December 14, 2026, to decide whether to enroll in, change, or cancel coverage for FEHB and PSHB. U.S. Off. of Pers. Mgmt., *Open Season*, https://perma.cc/6BHH-GTX5, (last visited Oct. 28, 2026). Choices must be made during this period for the entirety of the 2027 plan year; federal beneficiaries "cannot enroll, change [their] enrollment, or cancel [their] coverage in these programs outside the Open Season unless [they] experience a Qualifying Life Event." *Id.* Thus, transgender beneficiaries, including Plaintiffs, navigating open enrollment are presently facing unique, concrete, and imminent challenges to securing medically necessary treatment and procedures recommended by their care providers for 2027.

The choices presented during open season are constrained by a rule that applies to every available plan: none may cover hormonal or surgical gender-affirming care in 2027. For Ms. Coe and Ms. Voe, who have already lost coverage, the 2027 Exclusion will continue that denial and, importantly, deepen its consequences. For beneficiaries receiving care under a 2026 exception, it will end that coverage, bringing with it certainty of interrupted or wholly cancelled care that will cause irreparable harm. *See* 2026 Carrier Letter at 1–2; 2027 Carrier Letter at 2, 14; Voe Decl. ¶¶ 7-8, 10; Coe Decl. ¶¶ 8, 10; Amy R. Decl. ¶¶ 4, 7–10; Quinn H. Decl. ¶¶ 6–9, 14.

***Plaintiff Voe***

Vanessa Voe is a researcher who joined the federal workforce in August 2026 after a decade of working toward a prestigious laboratory position in her field. She is also a transgender woman who has been in transition for several years. Voe Decl. ¶¶ 2, 5, 6, 12. Since 2021, she has received HRT and has had gender-affirming surgeries, and she continues to need prescribed HRT and medical monitoring. *Id.* ¶¶ 5, 7, 11. When she enrolled in an FEHB plan in September 2026, she lost the insurance coverage for her gender-affirming care on which she had previously relied.

*Id.* ¶¶ 4, 6. Accepting the job meant weighing "everything [she had] worked for these past ten years against the loss of [her] required healthcare." *Id.* ¶ 6.

The loss of reliable access to gender-affirming care is undermining Ms. Voe's health. Her treating psychiatric mental health nurse practitioner, Diane Shallcross, describes the stability Ms. Voe had achieved with HRT and psychiatric care: she was engaged, confident, and a leader in her community. HRT has been "critical" to that stability. Shallcross Decl. ¶¶ 6–7. Ms. Voe's doctors have warned her that going without HRT can also cause bone weakening, muscle deterioration, and other withdrawal symptoms. Voe Decl. ¶ 8; Ex. I, Declaration of Elizabeth Oleson (Oleson Decl.) ¶¶ 7, 9–10. In addition to these physical changes, Ms. Voe fears that she will have significant mental distress and serious exacerbation of her gender dysphoria if she must ration HRT going forward:

> If typically masculine features re-emerge because I don't have access to HRT, I worry that my friends and colleagues will perceive me as a different person. I know myself to be outgoing, ambitious and a leader. When my symptoms of gender dysphoria emerge, I tend to isolate myself and withdraw from my marriage, my family, and my friends, which is what I fear would happen without HRT. In addition, under OPM's policy, I will not be in a position to pursue breast augmentation or electrolysis, both of which are treatments that my providers support.

Voe Decl. ¶ 10.

Without coverage, Ms. Voe will have to cut corners in her healthcare, forcing her to endanger her health to reduce out-of-pocket costs. Ms. Voe's prescribed HRT costs approximately $2,500 each year. *Id.* ¶ 7. Continuing to bear that expense in 2027 will require her to take less medication than prescribed and to forgo doctor-recommended blood tests that monitor her hormone levels. *Id.* ¶¶ 9, 11. She knows what rationing means for her health because she has done it before. During those periods, she experienced intrusive thoughts that interfered with daily functioning, brain fog, and severe irritability that damaged her relationships. *Id.* ¶ 9. She describes

hearing and feeling "constant noise and clutter in [her] head, as if [her] brain was not [her] own and someone else was behind the wheel." *Id.* She expects those symptoms to recur when she must ration again. *Id.* ¶ 10. If the 2027 Exclusion is allowed to go into effect, given the strain on her finances, Ms. Voe will be forced to forgo other doctor-recommended care including regular blood tests that monitor her sex hormones since she no longer naturally produces them. *Id.* ¶ 11.

Ms. Voe is experiencing fear about the immediate and permanent medical consequences to her physical health if she must forgo HRT because she cannot afford the treatment. *Id.* ¶ 8. Her anxiety has spiked; she now presents as defeated and withdraws from her community. Shallcross Decl. ¶¶ 8–9. Ms. Shallcross attributes this deterioration to Ms. Voe's concerns about consistent access to HRT, distinguishing it from broader stressors that were present when Ms. Voe was stable. *Id.* ¶ 10. Ms. Voe describes intense despair at being targeted by the government she serves and increased dysphoria because further treatment is out of reach. Voe Decl. ¶ 13. Leaving her job to find other insurance is not a viable solution; positions in her specialty are scarce, and this laboratory represents the culmination of her professional work. *Id.* ¶ 12.

The 2027 Exclusion will continue the loss of coverage that has already destabilized Ms. Voe and will force her to ration the treatment she needs. *Id.* ¶¶ 6–10. Continued treatment offers a way to preserve the stability she achieved: in Ms. Shallcross's clinical opinion, assured access to uninterrupted HRT, together with ongoing psychiatric care, would keep Ms. Voe's symptoms at bay. Shallcross Decl. ¶ 7.

### ***Plaintiff Coe***

Charlotte Coe has served in the federal government for eight years and works as an IT specialist at the Department of State. Coe Decl. ¶ 3. She is a transgender woman who has known herself to be a woman since childhood. Before transition, she felt she was "inhabiting the shell of a person that I didn't know." *Id.* ¶ 5. Through FEHB, she obtained HRT and gender-affirming

surgeries that helped her live in accordance with her identity. *Id.* ¶¶ 5–6. She now needs corrective surgery for a painful complication following her 2025 vaginoplasty, but the absence of coverage prevents her from obtaining it. *Id.* ¶¶ 7, 9–10.

Over the past few months, Ms. Coe has developed a lesion in the urethral mucosa that repeatedly reopens with pressure or friction. *Id.* ¶ 9. It causes pain and discomfort every day. When the lesion reopens, the sensation is like a "constant papercut"; even sitting causes significant pain. *Id.* She must continually consider how she sits, the tightness of her underwear, and her daily activities to avoid reopening the lesion or prolonging the time it remains open. *Id.* The open lesion also puts her at risk of infection and makes sexual activity painful and dangerous. *Id.* These physical symptoms cause distress and anxiety throughout the day. *Id.*

Ms. Coe's treating surgeon diagnosed the problem and recommended surgery to permanently correct it. *Id.* ¶ 11. She has been unable to obtain that treatment because his practice will not perform the surgery without insurance coverage. *Id.* She understands that the procedure could cost tens of thousands of dollars, and she has no means in place to cover that expense. *Id.* ¶¶ 11, 14. The result is continued pain from ordinary activities while the condition her doctor recommends repairing remains untreated. *Id.* ¶¶ 9–10, 14–15.

During Plan Year 2026, Ms. Coe has paid thousands of dollars out-of-pocket. She learned over the course of the year that her routine care would not be covered. *Id.* ¶¶ 8, 11–12. Paying for that care strains a budget that was already tight and makes it difficult to afford rent, food, and other bills. *Id.* ¶ 14. She has doubled her HSA contribution and forgone regular car maintenance to put money toward treatment. *Id.* She continues to need HRT and fears that losing access would impair her physical health and emotional stability. *Id.* ¶¶ 7, 13. Before treatment, she experienced depression and suicidal ideation, and she worries those symptoms will return without HRT. *Id.* ¶

13. Stopping treatment, she explains, would mean losing "the life I worked really hard to build." *Id.*

During FEHB's open season period, the 2027 Exclusion leaves Ms. Coe without an FEHB plan that will cover the care she needs. *Id.* ¶ 12. She fears that without HRT, she will have immediate, dire, and permanent medical consequences. *Id.* ¶ 13. Her need for corrective surgery is present and ongoing: her surgeon has recommended treatment to repair the lesion, and without access to it she continues to endure near-daily pain. *Id.* ¶¶ 9–10, 15. Restoring coverage would remove the barrier that currently prevents her from obtaining that treatment from her surgeon. The 2027 policy instead prolongs that barrier, requiring her to enter another plan year with the condition untreated and the cost of continuing care resting on her already strained finances. *Id.* ¶¶ 11–15. Accordingly, Ms. Voe and Ms. Coe now move for preliminary relief from the 2027 Exclusion during the pendency of this litigation. As explained in the motion for class certification being filed concurrently, Plaintiffs also seek to represent a class of beneficiaries consisting of: all federal employees and retirees (a) who are or will be enrolled in the FEHB or PSHB during Plan Year 2027; (b) who have been or will be prescribed or referred for gender-affirming care for themselves or a covered dependent in Plan Year 2027; and (c) whose coverage for that care is or will be excluded in Plan Year 2027 under OPM's 2027 Carrier Letter, so that the Court may grant this relief on a classwide basis.

## III. LEGAL STANDARD

A preliminary injunction is warranted where "(1) the moving party is likely to succeed on the merits; (2) the moving party is likely to suffer irreparable harm in the absence of preliminary relief; (3) the equities favor the issuance of an injunction; and (4) an injunction is in the public interest." *Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185, 1219 (D.C. Cir. 2026) (citation modified).

## IV. ARGUMENT

Plaintiffs satisfy each requirement for preliminary relief, such that an injunction is necessary to immediately halt the ongoing and serious harm to Plaintiffs and the putative class. The 2027 Exclusion threatens to interrupt or halt their medically necessary gender-affirming care and cause harm that a later judgment cannot repair; Plaintiffs are highly likely to succeed on their claim that OPM's ban on gender-affirming care violates Title VII; and the balance of equities and public interest favor preserving access to that care while this case proceeds. Plaintiffs also request that the Court waive security under Rule 65(c) or, alternatively, require only a nominal bond of $1.00.

### A. Plaintiffs and the Putative Class Face Irreparable Harm Absent an Injunction.

The evidence proffered by Plaintiffs demonstrates that actual, ongoing irreparable harm is occurring and likely to continue absent a preliminary injunction. Plaintiffs need not demonstrate that irreparable injury is inevitable, but only that it "is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). "[T]he harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation modified). Additionally, "[t]he harm must be beyond remediation." *Id.* Policies that "significantly hamper[]" the "ability to render effective medical services to those in need" create "just the sort of irreparable and unnecessary harm that carefully tailored, limited injunctive relief is intended to prevent." *Int'l Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 18-19 (D.D.C. 1996) (finding "a clear showing . . . of irreparable harm to the residents and the health care provider by virtue of the funding cut-off"). Financial harm "does not, in and of itself, constitute irreparable harm," *Cannon v. Allied Universal Sec. Servs.*, 2025 WL 3516157, at *1 (D.D.C. July 28, 2025) (citing *Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C.

Cir. 1985)), though "extreme financial hardship" may establish irreparable harm. *See, e.g.*, *Williams v. Walsh*, 619 F. Supp. 3d 48, 65 (D.D.C. 2022) (irreparable harm based on lost wages requires a "substantial evidentiary showing[]" of financial hardship); *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 32 (D.D.C. 2001) (loss of income irreparable where "subsistence employees" would have "great difficulty finding other work to avoid insolvency, eviction, and even to obtain food"). Plaintiffs are likely to suffer irreparable harm because, absent an injunction, they will continue to be denied necessary gender-affirming care, creating and exacerbating their symptoms and distress.

The 2026 Carrier Letter has already disrupted Plaintiffs' access to gender-affirming care. The 2027 Exclusion will keep Ms. Coe's corrective surgery out of reach and force Ms. Voe to forgo prescribed care, either by skipping blood tests or rationing prescribed HRT or both. Voe Decl. ¶ 9; Coe Decl. ¶¶ 11–12. An interruption in prescribed treatment can cause irreparable harm by threatening a patient's health during the litigation, and later relief cannot repair the consequences. *See, e.g.*, *L.W. by & through Ward v. Comm'r of Ga. Dep't of Cmty. Health*, 176 F.4th 635, 645-46 (11th Cir. 2026) ("The harm posed by the state's insufficient care is irreparable because it concerns L.W.'s health. . . . [L]acking sufficient care, L.W.'s condition can quickly decline, potentially causing death—the ultimate irreparable harm."); *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019) (recognizing diminished access to high-quality care suited to the patient's needs as tangible harm), *abrogated in part by Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357 (2025) (deciding that the Medicaid statute does not create a private right of action). This District has recognized that interference with timely medical care can cause injuries a later judgment cannot cure. *See, e.g.*, *Drs. for Am. v. OPM*, 766 F. Supp. 3d 39, 56 (D.D.C. 2025) (finding irreparable harm if "doctors cannot provide these individuals the care they need (and

deserve) within the scheduled and often limited time frame" because "there [was] a chance that some individuals will not receive treatment, including for severe, life-threatening conditions").

Courts addressing restrictions on gender-affirming care have likewise recognized the irreparable harm that denying such prescribed care can cause. *See, e.g.*, *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 449-50 (D. Md. 2025) (finding that interruption of prescribed care threatened health injuries that a later judgment could not repair); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (finding that plaintiff will "suffer irreparable harm—in the form of ongoing mental anguish and possible physical harm—if [gender confirmation surgery] is not provided"); *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1358 (N.D. Ga. 2023) (finding risks of depression, anxiety, self-harm, and suicidal ideation flowing from denial of HRT recommended by the plaintiffs' clinicians constituted irreparable harm), *injunction stayed*, No. 1:23-cv-2904-SEG, Dkt. No. 119 (N.D. Ga. Sept. 5, 2023); *Poe ex rel. Poe v. Labrador*, 709 F. Supp. 3d 1169, 1199 (D. Idaho 2023) (finding that interruption of ongoing HRT threatened serious psychological harm), *injunction stayed in part sub nom. Labrador v. Poe*, 144 S. Ct. 921 (2024), *appeal dismissed*, 2025 WL 1872749 (9th Cir. June 18, 2025); *Hicklin v. Precynthe*, 2018 WL 806764, at *9–10 (E.D. Mo. Feb. 9, 2018) (finding irreparable harm where Plaintiff has shown she will continue suffering from depression, anxiety, and intrusive thoughts without gender transition treatment).

Plaintiffs' injuries extend far beyond the expense of paying for care that OPM has excluded from coverage. Courts have held that monetary damages cannot adequately compensate for injuries caused by delayed medical care, including their gender-affirming care. *See LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 56 (2d Cir. 2004) (imminent threat of foregoing needed medical care constituted more than "mere monetary harm"); *Gordon v. Aetna Life Ins. Co.*, 2026

WL 643134, at *20 (D. Conn. Mar. 8, 2026) ("The lack of access to medically necessary gender-affirming care and the attendant health risks meet the standard for irreparable harm."); *Koe*, 688 F. Supp. 3d at 1358 (finding that risks of depression, anxiety, disordered eating, self-harm, and suicidal ideation flowing from state's ban on certain medical procedures for transgender minors presented imminent risks of irreparable harm to plaintiffs); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 946 (W.D. Wis. 2018) ("Ongoing impact on [transgender] plaintiffs' health" could not be sufficiently remedied by monetary awards); *Olson v. Wing*, 281 F. Supp. 2d 476, 486 (E.D.N.Y. 2003) ("The award of retroactive benefits cannot ameliorate the harm suffered if such a recipient should be forced by circumstances to forego treatment or medication."), *aff'd*, 66 F. App'x 275 (2d Cir. 2003); *cf. Karnoski v. Trump*, 2017 WL 6311305, at *9 (W.D. Wash. Dec. 11, 2017) ("[M]onetary damages proposed by Defendants will not . . . cure the medical harms caused by the denial of timely health care."). An eventual monetary award cannot restore Plaintiffs' health, daily functioning, and the emotional stability they lose absent a preliminary injunction.

Plaintiffs both need ongoing HRT in 2027 because their bodies are unable to naturally produce the sex hormones they need to function. Voe Decl. ¶ 8; Coe Decl. ¶¶ 7, 13; Oleson Decl. ¶ 14 ("People who cannot produce sufficient endogenous sex hormones—such as estrogen or testosterone—and rely on HRT may experience clinically significant consequences when they stop treatment and then restart, which may include vasomotor symptoms, hot flashes, night sweats, muscle mass shifting, and loss of bone density."). Beyond challenges with accessing HRT, Ms. Coe is already enduring the consequences of going without necessary treatment. Her postoperative complication causes daily pain, makes sitting difficult, and requires her to organize ordinary activities around avoiding further irritation and injury. Her doctor has recommended corrective surgery, but his practice will not perform it without insurance

coverage. Coe Decl. ¶¶ 9–11. Because of this, Ms. Coe cannot simply absorb the cost in the meantime, nor would she be in a financial position to do so: paying for ongoing care is already straining her ability to afford basic necessities, such as food and housing, and she has no means in place to cover a surgery costing tens of thousands of dollars. *Id.* ¶¶ 11, 14–15.

Ms. Voe's health is also presently deteriorating. She is suffering from increased anxiety, withdrawal, and isolation attributable to the loss of assured access to HRT. Shallcross Decl. ¶¶ 6–10. Continued exclusion in 2027 will require Ms. Voe to take dangerous measures that run afoul of her provider's instructions, including rationing her medication and forgoing recommended monitoring. Voe Decl. ¶¶ 9–11. She knows from prior interruptions what rationing entails—brain fog, intrusive thoughts that interfere with daily functioning, and irritability that damages her relationships. *Id.* ¶ 9. A later damages award cannot undo those experiences or restore the time spent withdrawing from her marriage, family, and community. Timely relief can prevent further deterioration. Shallcross Decl. ¶ 7. Otherwise, the 2027 Exclusion prolongs the conditions already harming Plaintiffs. An injunction would remove the coverage barrier standing between them and the gender-affirming care necessary to prevent further suffering.

Specifically, as Ms. Voe's treating psychiatric nurse practitioner explains, her gender dysphoria manifests as anxiety and social withdrawal and gender-affirming care "is an essential component" of her well-being and has been "critical" for her "achieving that stability." Shallcross Decl. ¶ 7. Since Defendant's changes to Ms. Voe's health coverage, her provider has seen "a marked changed" in Ms. Voe, who, previously was "engaged and confident, and a leader in her community," is now "completely different," and her anxiety has spiked. *Id.* ¶¶ 6, 8, 9. The decline in Ms. Voe's mental health is a direct result of her concerns about access to gender-affirming care. *Id.* ¶ 10. If Ms. Voe cannot access HRT, her provider expects that "her current and new symptoms

will worsen," noting that Ms. Voe may lose "valuable connections to which she has been a leader." *Id.* ¶ 13. Her provider further explains that, if Ms. Voe is forced off HRT, Ms. Voe's "fear over [Voe's] safety and her livelihood, which would in turn harm the household that depends on her income" would "worsen her mental health." *Id.* ¶ 14.

Even further, Ms. Coe faces imminent harm due to a post-surgical complication that is causing her daily and significant pain. Coe Decl. ¶ 9. She runs a significant risk of infection and needs an additional surgery that her doctor will not perform without insurance coverage. Ms. Coe's doctor's position is not uncommon; many doctors will not perform surgeries absent insurance coverage. *See generally* Inst. of Med. (US) Comm. on the Consequences of Uninsurance, *Care Without Coverage: Too Little, Too Late, 3: Effects of Health Ins. on Health,* https://www.ncbi.nlm.nih.gov/books/NBK220636/, (2002) ("Adults without health insurance coverage die sooner and experience greater declines in health status over time than do adults with continuous coverage."). Given that the 2027 Carrier Letter provides no alternatives for treating Plaintiffs' significant distress and health needs, a preliminary injunction is essential. *See Drs. for Am.*, 766 F. Supp. 3d at 56 (acknowledging irreparable harm based on limited alternatives); *PFLAG, Inc.*, 769 F. Supp. 3d at 450 ("[T]he sudden denial of medical care 'visits a tangible harm' on the health and well-being of Plaintiffs.") (citation omitted); *Koe*, 688 F. Supp. 3d at 1357 (finding irreparable harm because the "plaintiffs will be unable to obtain in Georgia a course of treatment that has been recommended by their health care providers in light of their individual diagnoses and mental health needs"); *Poe*, 709 F. Supp. 3d at 1198 (finding irreparable harm because "eliminating access" to gender-affirming care "would cause serious consequences, including severe psychological distress and, potentially, the need to regularly incur the expense of out-of-state travel or move out of state permanently").

The putative class's harms are also certain, actual, and imminent during this present period. Irreparable harm extends beyond Plaintiffs and is already changing how class members obtain care. For instance, to prepare for the loss of her HRT coverage in 2027, Amy R. is using opened estrogen vials beyond their recommended 28-day limit so that she can stockpile medication, despite the contamination risk. Amy R. Decl. ¶¶ 7–10. The 2026 Carrier Letter has already caused putative class members serious harm in the form of stress, anxiety, and fear about whether they will be able to access their needed care. Christine F., who needs ongoing HRT and cannot afford the approximately $100,000 cost of the colovaginoplasty she intends to undergo, reports that the ban has caused anxiety and depression and exacerbated her insomnia. Ex. L, Declaration of Christine F. (Christine F. Decl.) ¶¶ 9, 12–13, 16. Similarly, Quinn H., who also needs ongoing HRT, reports depression and suicidality since learning that her PSHB plan would not cover her care; paying for treatment out-of-pocket threatens her family's ability to afford food and other necessities. Quinn H. Decl. ¶¶ 7–9, 12–13.

The combination of the 2027 Carrier Letter's categorical exclusion of gender-affirming care with the impending open season for enrollment in healthcare benefits for the 2027 Plan Year has caused a crisis for transgender beneficiaries. Although Amy R.'s HRT has remained covered this year, she has been unable to move forward with surgery because she did not qualify for a surgical exception. Amy R. Decl. ¶¶ 12–16. Her gender dysphoria has worsened as she waits, and she cannot afford even the low end of the $30,000–$100,000 surgical cost range she anticipates. *Id.* Other putative class members describe the same obstacle they and covered dependents face in accessing care. Christine F. reports that her surgery would cost approximately $100,000 without coverage—an amount she cannot pay—and that she would have to delay it indefinitely. Christine F. Decl. ¶¶ 9, 12–14. Nancy F. describes years of waiting for her adult daughter's surgical

consultation, only to confront an anticipated six-figure surgery cost her family cannot afford. Ex. N, Declaration of Nancy F. (Nancy F. Decl.) ¶¶ 6–11. Like Named Plaintiffs, many putative class members require ongoing HRT and face serious, irreparable physical and psychological harm if their treatment is interrupted. Quinn H. Decl. ¶¶ 8–9; Ex. M, Jennifer C. Declaration (Jennifer C. Decl.) ¶ 9; Nancy F. Decl. ¶ 8; Herman Decl. ¶ 27 (reporting that 90% of adult respondents who had ever received gender-affirming HRT were still receiving it). It is therefore evident that later reimbursement cannot supply treatment during the period it is needed or undo the physical and emotional suffering that lack of access prolongs. The requested injunction addresses both the continuing denial of coverage and the elimination of existing exceptions, so that beneficiaries can obtain care while this case proceeds.

### B. Plaintiffs Are Likely to Succeed on the Merits of Their Title VII Claim.

OPM's 2027 Carrier Letter violates Title VII by eliminating all coverage for gender-affirming care. Right now, OPM withholds this employment benefit for most and intends in Plan Year 2027 to further withhold this benefit for all when that beneficiary seeks care as part of gender transition—precisely because they need the care by virtue of being transgender. The 2027 Exclusion permits coverage of the same procedures when used for other, non-gender-transition-related purposes. The coverage distinction, therefore, turns on sex: whether medical care is part of a gender transition depends on the employee's sex assigned at birth and the intended use of the treatment. The Supreme Court's mandate on this front is clear: sex-based distinctions cannot be used to diminish an individual's terms of employment. *See Bostock*, 590 U.S. at 669. The 2027 Exclusion discriminates because of sex on its face and independently enforces sex stereotypes by denying employees health benefits when they or their covered dependents seek gender-affirming care.

Title VII protects employees' "compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1).[8] Title VII prohibits sex discrimination in employer-provided health insurance. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983) ("Health insurance and other fringe benefits are 'compensation, terms, conditions, or privileges of employment.'") (quoting 42 U.S.C. § 2000e-2(a)); *see also Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984) ("A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the [entity] would be free under the employment contract simply not to provide the benefit at all."); *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 710-11 (1978) (applying Title VII to sex-based distinctions in employee insurance benefits). Title VII's protection extends to employer-provided coverage for employees' dependents; discriminatory restrictions on dependent coverage can impair the employee's own employment benefits. *See Newport News*, 462 U.S. at 682–84.

Title VII also prohibits discrimination based on an individual's failure to conform to sex stereotypes. *See West Virginia v. B. P. J. by Jackson*, 609 U.S. 958, 996 n.* (2026) (Gorsuch, J., concurring) (explaining that Title VII is implicated where entity action is based on one's "biological sex and because [they are] perceived to act in ways that defy some stereotype the [entity] holds about [their] biological sex"); *Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008) (holding that withdrawing a transgender applicant's job offer because her

---

[8] Although Plaintiffs here bring their claim under the federal sector provision of Title VII, under which "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination," 42 U.S.C. § 2000e-16(a), the D.C. Circuit holds that the private sector and federal sector provisions contain identical prohibitions on discrimination. *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007); *Singletary v. District of Columbia*, 351 F.3d 519, 523-24 (D.C. Cir. 2003); *Phelan v. Noem*, 2025 WL 2732749, at *7 (D.D.C. Sept. 25, 2025). *See also Figueroa v. Pompeo*, 923 F.3d 1078, 1083 (D.C. Cir. 2019) ("Personnel actions affecting employees" under 42 U.S.C. § 2000e-16 "include . . . the provision of 'compensation, terms, conditions, or privileges of employment.'").

appearance and background did not comport with the decisionmaker's "sex stereotypes about how men and women should act and appear" violated Title VII).

OPM's policy blatantly violates both prohibitions. OPM's ban on gender-affirming care makes sex a basis for denying coverage, and its terms and stated origins establish that OPM uses health benefits to enforce stereotypes about the physical characteristics employees should retain.

### *1. The 2027 Carrier Letter Facially Discriminates Because Of Sex*

The 2027 Carrier Letter directs carriers to "remove any exceptions process" for beneficiaries who are "mid-treatment within a surgical and/or hormonal regimen for diagnosed gender dysphoria." 2027 Carrier Letter at 14. That command carries forward the underlying exclusion of "chemical and surgical modification of an individual's sex traits through medical interventions (to include 'gender transition' services)." 2026 Carrier Letter at 1; *see* 2027 Carrier Letter at 2, 14. It requires carriers to deny coverage even where a beneficiary's ongoing treatment could previously have qualified for an exception.

There is no way to apply or describe the 2027 Exclusion without referencing or relying on sex. *See Bostock*, 590 U.S. at 668-69 (holding if one cannot "writ[e] out instructions . . . without using the words man, woman, or sex (or some synonym)," it is based on sex). An insurer must determine the employee's sex assigned at birth to understand how the treatment relates to the physical traits the employee seeks to change. Consider a woman seeking hormone treatment to develop feminine physical characteristics. If she was assigned male at birth, OPM considers that care a part of gender transition and bars coverage. If she was assigned female at birth, that exclusion does not apply. Holding her identity and treatment constant, changing her sex assigned at birth changes the coverage rule. That is the very discrimination *Bostock* identifies: penalizing a transgender individual for traits or actions tolerated in a cisgender individual. 590 U.S. at 660. The

2027 Exclusion nestled in both Carrier Letters also fails the settled test in the benefits context—whether an employee is treated "in a manner which but for that person's sex would be different." *Manhart*, 435 U.S. at 711. OPM has therefore made sex the basis for withholding part of an employee benefit.

OPM's instructions concerning medications speak the distinction out loud. OPM requires carriers not to exclude entire pharmaceutical classes on the basis of its policy, identifying uses eligible for coverage, including fertility treatment, treatment of endometriosis or fibroids, and cancer treatment. 2026 Carrier Letter at 2. What places a medication within the exclusion is its use to change an employee's sex traits as part of gender transition. Calling that a restriction on the purpose of treatment does not make the decision independent of sex; determining whether treatment is covered can only be done by reference to the beneficiary's sex. Title VII forecloses this kind of relabeling. *See Manhart*, 435 U.S. at 712 (rejecting the characterization of a sex-based benefits differential as one based on longevity).

Because the discrimination is written into the policy, no further evidence of discriminatory motive is necessary. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (whether a practice involves "disparate treatment through explicit facial discrimination does not depend on why the [entity] discriminates but rather on the explicit terms of the discrimination"). Whether a rule facially discriminates turns on the rule's direct terms, not the entity's reasons for adopting it. *See id.* at 199-200; *see also Bouknight v. District of Columbia*, 680 F. Supp. 2d 96, 108 (D.D.C. 2010) (explaining that a benign motive would not excuse a disciplinary recommendation based on the employee's race). The Carrier Letters identify modifying sex traits and gender transition as sole grounds for denying coverage. That choice establishes disparate treatment.

Nor does the policy become lawful because some transgender employees will not need the excluded treatment, or because it bars gender-affirming care for transgender men and transgender women alike. Title VII protects each employee against discrimination; it does not merely compare how men and women fare in the aggregate. *Bostock*, 590 U.S. at 658-62. A rule can discriminate because of sex even when it burdens only those employees who share an additional characteristic. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 543-44 (1971) (per curiam) (rejecting different hiring standards for women and men with preschool-age children); *Barnes v. Costle*, 561 F.2d 983, 991 (D.C. Cir. 1977) ("In all of these situations, the objectionable employment condition embraced something more than the employee's gender, but the fact remained that gender was also involved to a significant degree."); *see also Bostock*, 590 U.S. at 667. For beneficiaries who need gender-affirming care as part of their transition, sex determines the loss of coverage.

The continued availability of counseling and other medical benefits cannot cure that loss. Each employment benefit must comply with Title VII; an employer cannot offset discrimination in one benefit by providing others without discrimination. *Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1081-82 n.10 (1983) (Marshall, J., concurring). Transgender beneficiaries' access to unrelated care therefore supplies no answer to the exclusion of their transition care.

Courts have applied these principles to statutory claims, including Title VII, challenging exclusions of gender transition-related care from health benefits. *See Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018) (holding that a state employee health plan's exclusion of gender transition-related care discriminated because of sex under Title VII); *see also Hammons v. Univ. of Maryland Med. Sys. Corp.*, 649 F. Supp. 3d 104, 117 (D. Md. 2023) (granting summary judgment for the plaintiff, applying *Bostock* to Section 1557 to conclude that policy prohibiting

gender-affirming care discriminates on the basis of sex); *Gordon*, 2026 WL 643134, at *25-26 (finding a likelihood of success under Section 1557 where an insurer excluded facial procedures performed as part of gender transition), *injunction stayed pending appeal*, No. 26-820, Dkt. No. 52 (2d Cir. July 10, 2026).

*United States v. Skrmetti*, 605 U.S. 495 (2025), does not alter that conclusion.[9] The decision upheld a state's restrictions on medical treatment for minors against an equal-protection challenge. The Supreme Court indeed reserved the question of whether *Bostock* extends "beyond the Title VII context." *Id.* at 520. This case requires no extension as it is squarely within the confines of *Bostock*: it challenges sex discrimination in an employment benefit under Title VII itself. Importing the constitutional analysis into this statutory claim would also invoke the error prohibited in *Newport News*, 462 U.S. at 676–81. There, the Court explained that Congress rejected both the holding and the reasoning of *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), which had borrowed *Geduldig v. Aiello*'s equal-protection analysis to sustain a pregnancy-related benefits exclusion under Title VII. The standards are not interchangeable. A cost justification potentially relevant to the constitutionality of a benefits restriction does not excuse discrimination established under Title VII. *Newport News*, 462 U.S. at 685 n.26. OPM therefore cannot defend its use of sex in setting the terms, conditions, and compensation for employment by invoking the

---

[9] Plaintiffs preemptively raise this argument because the federal government, on behalf of the President and agencies other than OPM, has argued that *Skrmetti* defeats statutory sex-discrimination claims challenging restrictions on gender-affirming care adopted under these same executive orders. *See, e.g.*, Brief for Appellants at 54-56, *PFLAG, Inc. v. Trump*, No. 25-1279 (4th Cir. July 25, 2025), Dkt. No. 33 (addressing Section 1557 of the Affordable Care Act and the Public Health Service Act). *See also Sam T. v. Kupor*, EEOC Appeal Nos. 0120172750, 0120172751, 2020000643 & 2021005019, at 4-7 (Mar. 24, 2026) (applying *Skrmetti*'s reasoning to FEHB claims under Title VII and overruling *Lawrence*). Federal employees are entitled to *de novo* judicial consideration of their Title VII claims. *Chandler v. Roudebush*, 425 U.S. 840, 863–64 & n.39 (1976).

latitude afforded a state under rational-basis review. Title VII supplies the governing rule, and *Bostock* establishes that transgender status is a forbidden basis for adverse treatment under that rule.

***2. The 2027 Exclusion Also Enforces Impermissible Sex Stereotypes.***

Because the 2027 Exclusion facially discriminates based on sex, no further inquiry into motivation is needed. But even if such an inquiry were needed, there would be more than sufficient evidence that gender is the animating feature of OPM's policy to establish a likelihood of success on the merits.

The stated origins of the 2026 Carrier Letter provide that evidence. OPM identifies EO 14168 and EO 14187 as prompting its initial carrier instructions. OPM, *FEHB Program Carrier Letter No. 2025-01A*, at 1-2 (Jan. 31, 2025). The former characterizes recognition of a gender identity different from birth-assigned sex as a "false claim" and directs agencies to eliminate policies promoting what it calls "gender ideology." EO 14168 at 8615-16; *see also Talbott v. United States*, 176 F.4th 720, 742-43 (D.C. Cir. 2026), *appeal docketed sub nom. United States v. Talbott*, No. 26-272 (Sept. 1, 2026) (recognizing claims "repeatedly made in . . . Executive Order [14183] and policy documents" that "persons with a 'false gender identity' [were] unfit for the military," as evidence of sex-based stereotyping). The Executive Order asserts that "sexes are not changeable and are grounded in fundamental and incontrovertible reality." EO 14168 at 8615-16. The Executive Order further claims that the Supreme Court's decision in *Bostock* has been "misappli[ed]" to "sex-based distinctions in agency activities." *Id.* at 8616.

The latter EO defines prohibited care, "chemical and surgical mutilation," as "the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the

use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions," which the Order acknowledges is also known as "gender affirming care." EO 14187 at 8771. OPM carried that policy into federal employees' health coverage, extending the exclusion of hormonal and surgical care for gender transition to beneficiaries of all ages, demonstrating its unified position with the Administration to eliminate gender-affirming care due to its views on gender identity. *See* Mem. Op. at 18–20, *Washington v. Trump*, No. 25-cv-244 (W.D. Wash. Feb. 16, 2025), Dkt. No. 161 (explaining that EO 14187, read with EO 14168's definitions, makes access to treatment depend on whether the resulting physical changes conform to stereotypical attributes associated with the individual's sex); *cf.* Mem. Op. at 3–7, 24–26, *Endocrine Soc'y v. FTC*, No. 26-cv-512 (D.D.C. May 7, 2026), Dkt. No. 38 (considering EO 14168 and EO 14187 rejecting transgender identity and subsequent agency actions as circumstantial evidence of retaliation against an organization advocating gender-affirming care).

With the Executive Orders as its backdrop, OPM then uses health benefits to enforce the expectation that employees should retain the physical characteristics associated with their sex assigned at birth. It denies coverage for hormonal and surgical care that aligns those characteristics with the employee's gender identity, and the 2027 Carrier Letter removes the exceptions process for employees already receiving treatment. 2026 Carrier Letter at 1-2; 2027 Carrier Letter at 14. Withholding that employment benefit imposes a financial penalty for failing to conform to a sex stereotype. An employer may not make conformity to such expectations a condition of equal

treatment in employment. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989) (plurality opinion); *Bostock*, 590 U.S. at 658–59; *see also Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 347 (7th Cir. 2017).

The expectation that people should identify with the sex assigned to them at birth is itself a sex stereotype. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 38 (D.D.C. 2020). The view espoused in the EOs and endorsed in OPM's policy is that "cisgender individuals properly adhere to their natal sex and that transgender individuals have inappropriately *chosen* a contrary gender identity." *Doe v. Ladapo*, 737 F. Supp. 3d 1240, 1256 (N.D. Fla. 2024) (finding that anti-transgender animus motivated Florida statute and rules restricting gender-affirming care).

An exclusion of gender transition care enforces that expectation by withholding coverage from beneficiaries who seek to change the physical characteristics associated with that sex. *See Boyden*, 341 F. Supp. 3d at 997 (holding that an exclusion effectively requiring transgender employees to maintain birth-assigned sex characteristics constituted sex stereotyping). This District has likewise held that a federal employer violates Title VII when it penalizes a transgender applicant's departure from expectations about how men and women should look and act. *Schroer*, 577 F. Supp. 2d at 305-06, 308; *see Talbott*, 176 F.4th at 743 (rejecting ban on transgender persons serving in the military as based on "archaic and overbroad generalizations about sex"). OPM's 2027 Carrier Letter imposes precisely that penalty through the health benefits employees receive for their work.

For employees with transgender dependents, the same discrimination operates through the family coverage they receive as an employment benefit for their work. One federal employee, for example, has covered her transgender spouse through her FEHB plan since 2012; the exclusion

prevents that employment benefit from covering the gender-affirming surgeries her spouse needs. Jennifer C. Decl. ¶¶ 4, 6–10. OPM restricts that employment benefit because a covered family member seeks treatment inconsistent with the Administration's prescribed expectations for that person's sex. The employee thus loses coverage because the dependent departs from those expectations.

The expectation that transgender people conform to their sex assigned at birth thus became a restriction on the health benefits they receive for their work. Title VII does not permit OPM to penalize beneficiaries' departure from that stereotype by taking away health coverage.

### C. The Balance of the Equities Weighs in Favor of Plaintiffs Because the Public Interest is Best Served by the Issuance of a Preliminary Injunction.

"In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation modified). The balance of equities and public interest merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. The public has a strong interest in both the enforcement of civil rights laws and timely, uninterrupted access to prescribed care. *See Newby*, 838 F.3d at 12; *Drs. for Am.*, 766 F. Supp. 3d at 56; *Shalala*, 947 F. Supp. at 20 (recognizing the public interest in uninterrupted health-care funding and avoiding unnecessary disruption of care); *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 2023 WL 8777349, at *1, *6 (W.D. Wash. Dec. 19, 2023) (recognizing the public-health interest in access to prescribed gender-affirming care), *vacated and remanded on other grounds sub nom. Pritchard ex. rel. C.P. v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646 (9th Cir. 2025). Preserving treatment access while the Court adjudicates this challenge to discrimination in federal employment benefits serves both interests.

Preserving access to care also protects federal employees' ability to remain in public service without sacrificing their own or their families' health. Nancy F., a nurse caring for veterans, accepted a pay cut to obtain FEHB coverage for her daughter and already works nights and weekends to support her family. Christine F. explains that seeking coverage through a new job would mean losing the housing tied to her federal position and likely relocating her family away from their home. Nancy F. Decl. ¶¶ 3, 9–11; Christine F. Decl. ¶ 15. Those consequences reinforce the public interest in removing the common coverage barrier while this case proceeds. The requested injunction would allow carriers to consider claims under otherwise applicable, nondiscriminatory plan terms and remove the barrier preventing beneficiaries from obtaining or sustaining prescribed care. *See PFLAG, Inc.*, 769 F. Supp. 3d at 451 (weighing threatened disruption of patient treatment against the government's asserted injury from preserving funding).

Plaintiffs' risks to health and continuity of care weigh heavily in favor of preserving that process during this litigation. *See, e.g.*, *Koe*, 688 F. Supp. 3d at 1358 ("[T]he Court determines that the imminent risks of irreparable harm to Plaintiffs flowing from the ban—including risks of depression, anxiety, disordered eating, self-harm, and suicidal ideation—outweigh any harm the State will experience from the injunction."). Indeed, "[f]ollowing antidiscrimination laws is not a hardship." *C.P. ex rel. Pritchard*, 2023 WL 8777349, at *6 (concluding that, compared to transgender plaintiffs' "disproportionate harm if a permanent injunction is not entered," related to the defendant's discriminatory exclusions of gender-affirming health care, the defendant's harm was "comparatively inconsequential"). Moreover, considering that Plaintiffs are likely to succeed on the merits of their claims, as set forth above, granting a preliminary injunction would allow for Title VII's protections to once again cover Plaintiffs, as designed. *See, e.g.*, *Moore v. Summers*, 113 F. Supp. 2d 5, 27-28 (D.D.C. 2000) (determining that the balance of the equities favored an

injunction under Title VII, in part, because "such relief would serve the public interest in combating discrimination and retaliation").

As such, preserving necessary gender-affirming health care for Plaintiffs and the putative class satisfies the public interest in uninterrupted health care. The scope of relief requested is tailored to ensuring that health care is not interrupted for Plaintiffs and the putative class members. If the Court grants the preliminary injunction, Plaintiffs can continue their HRT without interruption. Putative class members who need post-operative care, like Ms. Coe, will not suffer needlessly for months on end from infections, pain, and distress. The evidence presented by Plaintiffs, putative class members, and medical providers establishes that transgender beneficiaries risk mental and physical decline, and ameliorating those harms is consistent with the public interest. Shallcross Decl. ¶¶ 6-10; Oleson Decl. ¶¶ 9, 13–16.

Any harm to OPM as a result of issuing an injunction prohibiting enforcement of the 2027 Exclusion is far outweighed by the injuries suffered by Plaintiffs and the putative class. To the extent a preliminary injunction may increase costs for Defendant, courts have not found this argument compelling where, as here, the plaintiffs seek an injunction to access necessary medical care. *See, e.g.*, *C.P. ex rel. Pritchard*, 2023 WL 8777349, at *6 (determining that the damage to Blue Cross resulting from a permanent injunction enjoining it from enforcing exclusions that wholly exclude or limit coverage for gender-affirming care was "inconsequential"); *K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1268 (S.D. Fla. 2011) ("fiscal harm" to the defendant was "far outweighed by the harm" to the plaintiff if he does not "immediately receive" medically necessary treatment); *Bontrager v. Ind. Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 611 (7th Cir. 2012) (recognizing that the state's budgetary concerns should be considered "but do not outweigh the potential harm to [plaintiff and others], especially when the State's position is likely in violation

of state and federal law”). Given that Plaintiffs and the putative class are experiencing severe harm that will continue absent an injunction and there is little harm, if any, to Defendant in preserving the status quo and adhering to Title VII, this Court should conclude that the remaining factors support granting an injunction. In sum, the preliminary injunction serves the public interest in uninterrupted and continued health care.

**D. The Court Should Waive Security or Require Only a Nominal Bond.**

Rule 65(c) generally requires security, but “vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond.” *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). “The D.C. Circuit has also held that district courts have the discretion to ‘dispense with any security requirement whatsoever’ when there has been no showing that the absence of a bond would prejudice the defendants.” *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 224 (D.D.C. 2025) (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass’n*, 636 F.2d 755, 759 (D.C. Cir. 1980)).

Plaintiffs request waiver of security. Their declarations establish the financial and emotional burden of continued denial of access to their gender-affirming care. Voe Decl. ¶¶ 8, 10–11; Coe Decl. ¶¶ 12–13. In setting security in this case, this Court should consider any demonstrated monetary injury Defendant would sustain if wrongfully enjoined, the limited relief requested, and the importance of the statutory rights at stake. *See* Mem. Op. at 24-25, *Cable News Network, Inc. v. Trump*, No. 26-cv-3287 (D.D.C. Oct. 13, 2026), Dkt. No. 50 (setting a $1.00 bond after considering the absence of demonstrated monetary injury and the importance of the rights asserted); *League of United Latin Am. Citizens*, 780 F. Supp. 3d at 224 (“[M]ultiple courts in this District have recently declined to require plaintiffs to post any bond as a condition of obtaining an injunction against agencies or officers of the federal government.”).

The Court may also consider that Plaintiffs have made a strong showing on each of the preliminary injunction factors. *See, e.g.*, *Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, 793 F. Supp. 3d 166, 198 (D.D.C. 2025) (setting a $100.00 bond because a "significant bond 'would conflict with both the Court's findings that each of the preliminary injunction factors weigh heavily in [MAEC's] favor'"). In sum, given that paying a substantial bond would thwart Plaintiffs' ability to afford their healthcare even if their requested relief is granted, the public importance of effectuating anti-discrimination laws and preserving Plaintiffs' health and well-being, and the strong showings Plaintiffs have set forth on their likelihood of success, Plaintiffs respectfully request that this Court waive the posting of any bond as a condition of entry of a preliminary injunction. Alternatively, Plaintiffs request a nominal bond of $1.00.

### E. Plaintiffs Have Standing to Challenge the 2027 Exclusion

To establish standing, Plaintiffs must show: "(1) an injury in fact, (2) fairly traceable to the challenged agency action, (3) that will likely be redressed by a favorable decision." *Kansas Corp. Comm'n v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018). At the preliminary-injunction stage, Plaintiffs must demonstrate a substantial likelihood of standing through specific facts supported by declarations or other evidence. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912–13 (D.C. Cir. 2015). In determining whether Plaintiffs have shown a substantial likelihood of standing, this Court must "assume that on the merits the plaintiffs would be successful in their claims." *In re Navy Chaplaincy*, 697 F.3d 1171, 1175 (D.C. Cir. 2012).

Plaintiffs have put forth evidence that, pursuant to the 2027 Exclusion, Ms. Coe's and Ms. Voe's gender-affirming care will be completely uncovered by their FEHB plans in Plan Year 2027. *Supra* 13-18; *see* 2027 Carrier Letter. While the 2026 Carrier Letter provided for a limited exceptions process, OPM has eliminated all exceptions for 2027. The coverage provided in the 2026 plan year is about to come to an end, and enrollees like Plaintiffs must make choices during

the upcoming open season period. If an injunction is granted, Plaintiffs will be able to elect plans that best meet their continuing and crucial health care needs.

### *1. Plaintiffs Face Denial of Coverage for Their Prescribed Care.*

"An injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). Where an agency "is sufficiently committed to a particular [sex]-conscious policy" that is likely to cause the plaintiff an impediment, there can be "little doubt that [the plaintiff] has standing to bring a facial challenge to [that policy]." *Worth v. Jackson*, 451 F.3d 854, 859 (D.C. Cir. 2006) (finding that the plaintiff was injured in fact by a policy that "committed HUD to a race-conscious policy favoring minorities and women").

The 2027 Carrier Letter requires every participating carrier to deny coverage for hormonal and surgical care for gender transition, without a mid-treatment exception. 2026 Carrier Letter at 1–2; 2027 Carrier Letter at 2, 14. Ms. Coe and Ms. Voe seek relief from that continued denial of coverage for their necessary HRT and post-surgical care. Voe Decl. ¶ 8; Coe Decl. ¶ 7. The injury is concrete and particularized: the 2027 Exclusion imposes discriminatory terms on Plaintiffs' employment benefits and forces them either to bear treatment costs themselves or to go without prescribed care. As Ms. Voe explained, she will have to make decisions at the cost of her health, including rationing HRT, which will cause her pain and suffering, or forgoing recommended blood work, which puts her at risk of illness. Without insurance coverage, Ms. Coe cannot obtain the corrective surgery she needs from her surgical provider. Her medical provider will not perform the necessary procedures on patients who do not have insurance coverage. Thus, in order to repair the painful lesion and prevent a near-constant risk of infection, Ms. Coe needs the Court's immediate

intervention. OPM's directive to deny gender-affirming care is mandatory, and its implementation in the coming plan year makes the threatened injury concrete and imminent.

### *2. Plaintiffs' Injuries Are Fairly Traceable to the 2027 Carrier Letter and Redressable by Injunctive Relief.*

Plaintiffs must show a "causal connection between the injury and the conduct complained of," such that their harm is fairly traceable "to the challenged action of the defendant," rather than "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. "Generally, this is a 'but for' test—if some part of the alleged injury would not have occurred, or will not occur, but for the challenged action, then the injury is fairly traceable to the challenged action." *Cherokee Nation v. U. S. Dep't of the Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022) (citation omitted). For redressability, Plaintiffs must show that their sought relief would "remedy [their] alleged injury." *Lujan*, 504 U.S. at 568. Additionally, when "the plaintiff is himself an object of the action (or forgone action)" there "is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561-62.

OPM requires every participating carrier to enforce the underlying coverage ban in Plan Year 2027 and eliminates the remaining mid-treatment exceptions process. 2026 Carrier Letter at 1–2; 2027 Carrier Letter at 2, 14. The resulting denial of coverage follows from OPM's mandatory instructions, rather than an independent carrier decision. Plaintiffs seek an injunction barring enforcement of the full 2027 Exclusion and requiring OPM to direct carriers to remove it and administer coverage under otherwise applicable, nondiscriminatory plan terms. That relief would remove the discriminatory barrier to coverage for their prescribed treatment. Plaintiffs are themselves subject to the challenged policy, and their declarations identify the care that the exclusion prevents them from obtaining or sustaining. Voe Decl. ¶¶ 6–10; Coe Decl. ¶¶ 8–14.

Their injuries are therefore fairly traceable to OPM's policy and likely to be redressed by the requested relief.

## V. CONCLUSION

For these reasons, Plaintiffs respectfully request a preliminary injunction prohibiting Defendant from requiring or enforcing the 2027 Exclusion pending final judgment. The injunction should require Defendant to direct FEHB and PSHB carriers to remove that exclusion and administer coverage for Plaintiffs and the certified class under otherwise applicable, nondiscriminatory plan terms. Plaintiffs further request waiver of security or, alternatively, a nominal bond of $1.00.

Dated: November 4, 2026

Respectfully submitted,

/s/ Harini Srinivasan

Harini Srinivasan (D.C. Bar No. 1032002)
Aniko Schwarcz (D.C. Bar No. 980631)
COHEN MILSTEIN SELLERS & TOLL LLP
1100 New York Avenue NW, Suite 800
Washington, DC 20005
(202) 408-4600
hsrinivasan@cohenmilstein.com
aschwarcz@cohenmilstein.com

Cathy Harris (D.C. Bar No. 467206)
Jonathan C. Puth (D.C. Bar No. 439241)
Kelsey S. Speyer (D.C. Bar No. 90007426)
CORREIA & PUTH, PLLC
1400 16th Street NW, Suite 450
Washington, D.C. 20036
(202) 602-6500
charris@correiaputh.com
jputh@correiaputh.com
kspeyer@correiaputh.com

Cynthia Cheng-Wun Weaver
(NY Bar No. 5091848)
Ami Rakesh Patel (CA Bar No. 325647)
HUMAN RIGHTS CAMPAIGN FOUNDATION

1640 Rhode Island Avenue NW
Washington, DC 20036
cynthia.weaver@hrc.org
ami.patel@hrc.org

*Counsel for Plaintiffs and the Proposed Class*